# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| In re: Team America, Inc., | Case No. 2:08-cv-0301 |
| Debtor. | Judge Graham |
| | Chapter 11 |
| Excel Association Management Inc., et al., | Adv. Pro. No. 03-2509 |
| Appellants-Plaintiffs, | |
| v. | |
| The Huntington National Bank, N.A., | |
| Appellee-Defendant. | |

## OPINION AND ORDER

This is an appeal from a Memorandum of Opinion and corresponding Judgment entered February 17, 2008 by the United States Bankruptcy Court for the Southern District of Ohio, Eastern Division. Plaintiffs/Appellants Excel Association Management, Inc., G & W Products, Inc., and Linco Electromagnetic, Inc. allege that the Bankruptcy Court failed to properly follow the Equitable Rule of Setoff under Ohio law when it found no interest was retained in monies they paid to Debtor Team America, Inc. Plaintiffs paid the funds into a bank account that Team America held with Defendant/Appellee The Huntington National Bank.

This court finds that the Bankruptcy Court correctly held that a Client Service Agreement between Plaintiffs and Debtor did not provide for the retention of any property interest in the funds once Plaintiffs deposited them into Team America's account. The Bankruptcy Court also correctly refused to impose a constructive trust on the funds. Accordingly, Huntington properly exercised its contractual security rights when it setoff funds in Team America's general accounts against debts Team America owed to the bank. The judgment of the Bankruptcy Court is thus AFFIRMED.

I.   **FACTUAL BACKGROUND**

Team America, Inc. was a co-employment organization, commonly referred to as a professional employer organization and/or employee leasing company that provided personnel management services to its clients. These services included the hiring, firing, discipline, direction and control of co-employees, the establishment of human resource policies and procedures, maintenance of employment records, paid wages and payroll taxes, and employee benefits. (Bankr. Op. at 2). Under the co-employment arrangement, companies who hired Team America outsourced significant personnel functions.

The relative obligations between the co-employers were described in a Client Service Agreement ("CSA"). The CSA governed the relationship between Team America and the Plaintiffs. By agreement the Plaintiffs would provide Team America with the hours each employee worked on the week payroll was to be made. (Amended Compl. ¶ 12). Team America would then notify Plaintiffs of the amount of money necessary to pay the wages, taxes, benefits, and insurance for the employees as well as its service fee. (Amended Compl. ¶ 13) Plaintiffs were required to wire sufficient guaranteed funds into Team America's account at Huntington bank. Team America would then send payroll checks which Plaintiffs would distribute to the employees. Id.

The CSA did not "a. condition the Debtor's issuance of payroll upon receiving the guaranteed funds; b. require the Debtor to segregate the Plaintiffs' funds; c. dictate the use of specific sums for payroll; or, d. establish an express trust for the benefit of the Plaintiffs." (Bankr. Op. at 3).

In 2000 Team America entered into a Credit Agreement with Huntington to secure loans and financial accommodations. (R. 97, *Stipulations,* ¶ 3). Team America granted Huntington fully-perfected security interests in and liens upon all of their assets and proceeds. The Credit Agreement

2

expressly granted to Huntington a right of setoff against the Team America deposit account at Huntington.

In mid-September 2003 Team America's accounts became significantly overdrawn. National City Bank, as agent bank declared a default on behalf of Huntington, provided written notice to Team America, and directed Huntington to ". . . take control of the collateral and preserve any cash balances in Team America's accounts." (R. 97, *Stipulations,* ¶¶ 17, 18). When Team America filed for Bankruptcy on September 26, 2003 it owed $11,973,799.08, plus interest, fees, and other charges to Huntington. (R. 97, *Stipulations,* ¶¶ 5, 19). On September 26th, 2003, Huntington set off approximately $1,446,000.00 in funds. These cash balances allegedly included $290,001.69 that had been recently transferred by Plaintiffs to Team America between September 15th and 25th, 2003.

Plaintiffs brought suit in The United States Bankruptcy Court for the Southern District of Ohio Eastern Division in May 2005 seeking a determination that the sum of $290,001.69 was submitted to Team America to meet the Plaintiffs' payroll obligations, and on this basis was not property of the Debtor's estate. Plaintiffs alleged that the funds belonged to them and were held in constructive trust for their benefit.

The Bankruptcy Court held that there was ". . . no indication in the CSA that the Plaintiffs retained any control over the payroll functions of the Debtor once funds were transferred." (Bankr. Op. at 7). Because Plaintiffs "failed to sustain their burden" of proving the existence of a trustee or agency relationship, the Court granted judgment in favor of the Defendant. (Bankr. Op. at 2).

Appellants Excel, G&W, and Linco timely filed their Notice of Appeal. (R. 124).[1]

---

[1] Plaintiff Fangman & Company is not a party on appeal. The Bankruptcy Court made specific factual findings in reference to Fangman, "that [its] funds were lost prior to the setoff, and that the remaining account balances consisted of deposits made by other customers of the Debtor." (Bankr. Op. at 8). The total contributions at issue should thus be adjusted to reflect Fangman's departure. They are: Linco $184,904.86; G&W $65,627.60; and Excel $31,986.98; a sum total of

3

## II. JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction to hear bankruptcy appeals under 28 U.S.C. §158(a). A bankruptcy court's findings of fact must be upheld unless clearly erroneous. In re Downs, 103 F.3d 472, 476-77 (6th Cir. 1996); In re Southern Indus. Banking Corp., 809 F.2d 329, 331 (6th Cir. 1987); see also Bankr. R. 8013. A bankruptcy court's conclusions of law are reviewed de novo. Downs, 103 F.3d at 476-77; Stephens Indus. Corp., Inc. v. McClung, 789 F.2d 386, 389 (6th Cir. 1986).

## III. DISCUSSION

This appellate review hinges on the Bankruptcy Court's finding that Plaintiffs "failed to establish that they retained any property interest in . . . funds once deposited in the Debtor's accounts at the Defendant bank." (Bankr. Op. at 6). Essential to this determination is the Bankruptcy Court's reading of the Client Services Agreement, a contract that governed the relationship between the Debtor and the Plaintiffs in full. Because the dispute relates to whether or not Plaintiffs maintained a cognizable interest in funds wired to Debtor, the Bankruptcy Court correctly looked first to the language of the Client Service Agreement that memorialized the parties' relationship.

### A. The Client Service Agreement required Team America to pay wages and benefits independent of its receipt of Plaintiffs' funds.

Because "interpretation of a contract is a matter of law subject to de novo review," the court's inquiry begins with a thorough consideration of the agreement's relevant terms. First Bank of Ohio v. Brunswick Apartments of Trumbull County, Ltd., 215 B.R. 520, 522 (6th Cir. B.A.P. 1998).

---

$282,509.44.

4

It is well established under Ohio law that, in construing written agreements, courts should read the document in its entirety, and garner the intentions of the parties, "from a consideration of the whole." Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth., 78 Ohio St. 3d 353, 361 (Ohio 1997). To this end, "the language and terms of the contract are to be given their plain, common, and ordinary meanings." Id.

Section A, Part 1 of the Client Service Agreement's General Terms and Conditions outlined the services to be provided by the Debtor (Exhibit S-2). Item B describes "[p]ayment of wages to the Employees *without regard* to payments by the Client to Team." Id. (emphasis added). The Bankruptcy Court found that this provision did not "condition the Debtor's issuance of payroll upon receiving the guaranteed funds." (Bankr. Op. at 3). This court agrees.

Ohio follows the modern rule that "promises are to be construed as dependent or independent according to the intention of the parties and the good sense of the case." Hunt v. Salon DeCoiffures, 3 Ohio Misc. 2d 5, 7 (Ohio Mun. Ct. 1982). Although there is a presumption that promises "are...dependent *unless a contrary intent is shown*," here a contrary intent clearly exists. 15 Williston on Contracts § 44:11 (4th ed.) (emphasis added). See also Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd., 64 Ohio St. 3d 657, 665 (Ohio 1992) (the parties' intent must be determined from the plain language of the document).

The use of the language "without regard" in Section A, Part 1, Item B, has the plain, common, and ordinary purpose of divorcing two otherwise related obligations: 1. Team America's payment of wages to Plaintiffs' Employees, and 2. Plaintiffs' wiring of sufficient funds to Team America to cover the payment and fees. The operative effect of Section A, Part 1, Item B is to require the payment of wages and benefits by the co-employer, independent of its receipt of funds from the client.

5

Because the CSA allowed for the possibility that the co-employer might be forced to make payroll sometime before receiving a client's funds, Team America must have had alternative balances available to meet its obligations. The fact that no language in the CSA requires the segregation of funds by client, or identifies the use of specific sums for payroll supports the Bankruptcy Court's finding that the Agreement did not give Plaintiffs an interest in the funds it paid to Team America.

To the extent the Bankruptcy Court relied on the testimony of Plaintiffs' owners, the Debtor's chief executive officer, and its former general counsel, it made no mistake in determining that Plaintiffs "failed to establish that they retained any property interest." (Bankr. Op. at 6). A trial court's finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Tedeschi v. Falvo (In re Falvo), 219 B.R. 468, 663 (6th Cir. B.A.P. 1998) (quoting In re Matthews, 209 B.R. 218, 219 (6th Cir. B.A.P. 1997)). Here, the Bankruptcy Court noted that "there were no arrangements made with the Debtor to prohibit the commingling of their funds with those of the Debtor's other customers," and that "it would have been extremely difficult if not impossible to segregate the funds, since the Debtor had approximately 1,000 clients." (Bankr. Op. at 6). Both of these observations, garnered from witness testimony, support the Court's general conclusion that Plaintiffs retained no property interest in the funds paid to Team America. The Bankruptcy Court's factual findings comport with the plain language of the Client Services Agreement. This court must reject Plaintiffs' suggestion that the Bankruptcy Court should have interpreted the testimony in a manner contrary to the Agreement.

> **B.** **The Bankruptcy Court correctly declined to extend an Equitable Rule of setoff, because Plaintiffs lacked an interest in the funds paid to Debtor.**

The finding that Plaintiffs retained no interest in the funds they paid to Team America is essential to the resolution of their component equitable claims. According to Plaintiffs, the

6

Bankruptcy Court "completely ignored the law of set off in Ohio" by failing to acknowledge that a setoff cannot be effected when "another than the depositor has an interest in the deposited funds." (Appellant Br. 13). To support this proposition Plaintiffs point to <u>Federal Revue Company v. Fifth National Bank</u>, where the Sixth Circuit held that a bank was "precluded from offsetting . . . deposits" made into an account as proceeds of progress payments involving a contract. 867 F.2d 330, 331 (6th Cir. 1989).

Plaintiffs' position overlooks an important difference between the setoff that occurred in <u>Federal Revue Company</u> and the one here. There the Court of Appeals found "an express trust was formed by the contract," entitling the beneficiaries to the deposits. <u>Id.</u> Here, there is no such express interest, sanctioning Huntington's common law right to "apply deposits belonging to the depositor to the pre-existing indebtedness of the depositor." <u>Id.</u> at 334 (citing <u>Kopp Clay Co. v. State ex rel. Fulton</u>, 125 Ohio St. 512 (1932)).

### C. The Bankruptcy Court correctly held that imposition of a constructive trust was unwarranted.

Plaintiffs similarly fail to sustain their burden of a right to constructive trust, which must be shown by the production of "clear and convincing evidence." <u>University Hospitals of Cleveland v. Lynch</u>, 96 Ohio St.3d 118, 129 (Ohio 2002). According to Ohio law, a constructive trust is:

> [A] trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice.

<u>Ferguson v. Owens</u>, 9 Ohio St.3d 223, 225 (Ohio 1984) (quoting 76 American Jurisprudence 2d (1975) 446, Trusts, Section 221).

7

Plaintiffs maintain that the Bankruptcy Court erred by narrowing the scope of a constructive trust to apply only to "fraud, . . . by duress or abuse of confidence, . . . or by any form of unconscionable conduct." (Appellant Br. 12). Although the Bankruptcy Court's statement of Ohio law represents an abridged version of the Ferguson court's proclamation, its application of the law is correct.

The Bankruptcy Court observed that "there is no dispute that [Huntington] monitored the Debtor's cash position in the days prior to the setoff. Also, there is no doubt that the Defendant was aware of the Debtor's deteriorating financial condition, and that the merger efforts were faltering. There is, however, no inherent misconduct in such monitoring or the execution of a setoff by a secured lender holding a lien on bank deposits." (Bankr. Op. at 7). This court agrees.

Huntington was undoubtedly enriched by the setoff of funds it was contractually entitled to keep, but that enrichment was not unjust. Unjust enrichment is reserved for situations in which an individual "has and retains money or benefits which in justice and equity belong to another." Hummel v. Hummel, 133 Ohio St. 520, 528 (Ohio 1938). Because Huntington maintained valid setoff rights against the Debtor, its open exercise of those rights cannot constitute "actual or constructive" fraud, "duress," "abuse of confidence," "commission of a wrong," "unconscionable conduct," "artifice," "concealment," or "questionable means." Ferguson, 9 Ohio St.3d at 225. Further, since Plaintiffs retained no interest in the funds they deposited with the Debtor, the property Huntington obtained cannot be said to be held in violation of "equity and good conscience." Id.

Because Plaintiffs failed to demonstrate their entitlement by "clear and convincing evidence" to a constructive trust, the Bankruptcy Court correctly held the remedy to be precluded.

8

**IV.　CONCLUSION**

Accordingly, Plaintiffs' appeal is DISMISSED and the judgment of the Bankruptcy Court is AFIRMED.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: March 26, 2009